Case number 13-5239. James Gambrell et al. Appellants v. Isaac Fulwood, Jr. Chairman of the United States Parole Commission et al. Mr. Wallach for the appellants, Mr. Birch for the appellees. Good morning, Your Honors. Good morning. Your Honors, I have reserved two minutes for rebuttal. May it please the Court. This case involves an appeal of a motion of an order dismissing on Rule 12b-6 claims of D.C. co-defenders under 42 U.S.C. 1983 alleging that the U.S. Parole Commissioners violated their ex post facto clause rights when they applied unwritten practices, criteria, definitions to these individuals when at the time these individuals committed their crimes, D.C. Board of Parole used the 1987 regulations and the 1991 policy guidelines, which you just heard about in the former case, to decide parole decisions, to make parole decisions for D.C. co-defenders. In their complaint, plaintiffs alleged, and the U.S. Parole Commission has conceded, that at the time these plaintiffs committed their crimes, for which they are currently serving time, the 1987 regulations apply. For some of these individuals, they also committed their crime at the time after the 1991 policy guideline had been adopted. There are two individuals who committed their crimes before the 1991 policy guideline was adopted. In the complaint, plaintiffs alleged that the Commission, while representing that they had applied the D.C. parole guidelines, the 1987 regulations, had in fact applied their own interpretations of what they are terming those guidelines, applying their own definitions, their own criteria, that were inconsistent with the 1987 regulations and with the 1991 policy guideline. The District Court held that because plaintiffs allegedly could not, had not shown a second set of parole regulations, there was no basis for a search and comparison required by Fletcher in this case. Plaintiffs respectfully disagree. Just because the U.S. Parole Commission decides not to put something in writing does not mean that there has not been a change in their practices that would trigger an ex post facto clause violation. So the difference between the two cases, the one we just heard and your case, as I understand the Commission's position, is that whereas Mr. Bailey is comparing two schemes, written schemes, and showing, in his view, one is a scheme of very limited discretion, consistent with certain factors, and the other isn't, your allegations simply say, well, they said they were applying the 87 guidelines, but those guidelines, as they were applied, don't fit us, which is, I think, the, I won't anticipate, but I thought that's what Judge Brown's question was getting at in the last case. Yeah, no, Your Honor. We, the plaintiffs in this case, allege almost exactly what the plaintiffs in the Bailey case. Well, where do you allege almost exactly? We allege in the complaint that... The 87 regulations apply. Well, with the U.S. Parole Commission, it says that in all their notice of action, we're applying the 1987 regulations. That's right. In the Selman case, they had said the same thing in Mr. Gambrell's case itself. Yeah. Judge Vevelle, however, recognized that just because they say it, they're applying those regulations, doesn't mean they are, because in Mr. Gambrell's case, they had applied offense accountability, which was a factor that they could not apply under the D.C. parole guidelines. Right. And so, just because they start, now are starting to use the magic words of the 1987 regulations, does not mean that they are actually applying those guidelines. I think one, the Bailey case and this case raised very similar issues in terms of, is the parole commission's discretion unfettered? Is it unlimited? The Selman court rejected that notion. It rejected it in the original decision. It also rejected it on reconsideration. It also rejected it in Colby-Ford. The district court has consistently rejected the notion that the decision that the parole commission has unfettered discretion. If it had unfettered discretion, then why could it not use offense accountability? If it has unfettered discretion, there's nothing that prevents it from passing a guideline now saying, we're going to deem every person convicted of murder as having committed unusual cruelty to the victim by killing that victim. And therefore, that's a basis to deny every person committed of murder parole. If the legislature had done that in writing, that would undoubtedly be an ex post facto law. The legislature can't come here now, 20 years after these individuals have committed their crime and say, we're changing all of your sentences from 20 years to life, to parole, to 20 years, or to life imprisonment without parole. Here, the difficulty that the Supreme Court recognized in Gardner is that we're dealing with discretion. We're dealing with a body that has discretion. It's not unlimited, we suggest. The D.C. Board of Parole never thought it was unlimited. They adopted the 1987 guidelines for the specific purpose of focusing their attention on the factors that they thought mapped, narrowing their discretion. They adopted the 1991 policy guideline for the sole purpose of defining those terms in the 87 guidelines that they thought were being used all over the place because they wanted to focus and make it more fair. And just because the U.S. Parole Commission now has decided we can use whatever reason we want. For example, in the Selman case, one of Mr. Martin had been denied parole because of his propensity to use weapons, to carry weapons. And he had been convicted of a second crime in which he carried a weapon. Judge Hovell determined that was a criteria under the 87 guidelines that could not justify a departure. Okay, and where is that in your case? In my case? Yeah. In other words, you comment that the government's brief takes all this time going over the facts, but they also quoted what the commission said as to each of the plaintiffs. Your Honor, they quoted what the commission said in the notice of action. We have not had discovery, as we had in the Selman case, to determine what exactly was the under – if, for all we know, offense accountability could have been the reason. And they just said, well, let's use the magic words. We know we can't – based after Selman, we know we cannot use offense accountability. Let me just be clear. You had access to the notice of action. Yes, and we attached those to it. That's right. Yes. But all the notice of action says is we're applying the 87 guidelines, and maybe I'm misunderstanding your question. Well, in the red brief, and they cite to the joint appendix, all right, the government at great length has listed exactly what the commission said was the reason for its action. Correct. And do your clients allege that these are reasons that were impermissible? Yes, Your Honor. In our complaint, we identified the reasons with specificity that we alleged the parole commission was using, the magic words the parole commission was using, and showed why, under the 87 guidelines and the 91 policy guidelines, those – correct – those factors would not have applied. For Kenneth Easton, it's at page J26 of the joint appendix. Yeah. That's where the complaint starts, and we go claimant by claimant. I think the only one we did not do it for was Mr. Gambrell, whose primary claim is vindictiveness now. Although, based on his most recent notice of action, he may have a claim as well. Well, as to Mr. Easton, they talked about exceptional cruelty to a victim. Yes, Your Honor. And, Your Honor, what they say is he was exceptionally cruel to the victim by – well, in their notice of action, you murdered him by firing shots at him at point-blank range. If you look at the attachment, they include the – for Mr. Easton, the affidavit in support of an arrest warrant, there's only mention of a single shot. Now, so I guess the issue – So that's a misapplication. No, not if the – I mean, one shot as opposed to 17. Well, in terms of unusual cruelty, why was it – they didn't explain why it was unusually cruel to the victim to kill them after robbery. I would posit that maybe it's unusually cruel to anybody to kill them. But here, the 1987 guidelines and 1991 policy guidelines say it has to be something more than what was required for the offense. And this is the commission's analysis. Well, this is the commission's statement to the plaintiff as to why they're denying – they're allegedly denying his cruelty. In Selman, the court recognized that sometimes you have to go beyond that, such as where there's an indication that offense accountability has been used. I think if you were to look at the notices of action, there's a consistent theme after Selman came down that everybody's been – every murderer has been unusually cruel to their victim. It wasn't in Mr. Gambrell's 2008 notice of action. It's in his 2012 notice of action. He's now been unusually cruel to the victim. And granted, all of their crimes are heinous. The only question here, though, is whether – is whether having been presumed suitable for parole, is there a basis under the enumerated factors, under the 1987 guidelines and 1991 policy guidelines, to say notwithstanding that you are suitable, we think you are a risk. The commission would have it – have this court allow them to use any reason the commission found desirable, including offense accountability. They can say they don't want to use offense accountability, but if they have unlimited discretion, don't they have the discretion to use offense accountability? What Garner said – what – well, I would say they don't have the discretion to use offense accountability because the D.C. Board of Parole presumed that as soon as you became eligible for parole, you had satisfied all punishment for your crime. It was simply a – because the sentencing judge had decided what your minimum sentence should be and therefore factored in all of the aggravating factors of your crime and then – and sentenced you to that. And then the parole – the parole board or the parole commission, their sole focus was, is this person a danger to society if we let them out? And then in 1987, they adopted the regulations for the very purpose of using an actuarial model to help them reach that decision. They wanted to make – take it out of the subjective views of the individual members of the commission or of the board at that time, and they wanted to give some semblance of fairness and understanding for the prisoners involved as to when would you be eligible, why would you – what were the reasons that were going to be able to deny you parole, and what – and based on the set-off, if we deny you parole, when are you going to get another chance to hear us? If the commission has unlimited discretion, well, then they really could just decide that they're never going to parole someone, and they put a set-off hearing 20 years down the road. So what I'm trying to get you to focus on is you say your clients were presumed eligible for parole. All right, so I'm looking at addendum 30. Page 30. Yes, but I'm in the – Oh, the statutory addendum? I'm sorry. No problem. I just want to be sure I'm in the right place, which I have marked as being the 91 policy. Yes. And I'm at subsection C. Do you see that? Factors countervailing a recommendation to grant parole. Yes, on page 4 of the addendum. Yeah, so now go over to paragraph number 6, for example. Change in availability of resources? No. Or? My 6 starts out, instant offense involved unusual cruelty. Oh, I'm sorry. I was looking at the other ones. Where are you? And I'll find you. I found it. All right. I'm where you are. Yes, instant offense involved unusual cruelty to victims. Yeah. So isn't that what the commission was talking about with regard to Mr. Easton? Yes, but nothing in Mr. Easton's case suggested that he imposed physical, mental, or emotional abuse beyond the degree needed to sustain a conviction. If you accept Mr. Easton's explanation of what occurred, which the commission didn't set forth, and which they appear to have discounted based on we don't know what, Mr. Easton said this was a drug deal gone bad. So my point is you said, well, it was only one shot. I was only highlighting that as a – that's not the reason I didn't think it didn't qualify. The reason I think it didn't qualify was because it didn't meet this definition. It didn't impose physical, mental, or emotional abuse beyond the degree needed to sustain a conviction. He was found not guilty of robbery. So why isn't that a misapplication of the factor as distinct from an ex post facto violation? Well, because in all of these cases they're not even applying this definition. They're not even looking to – they don't make any attempt to explain why the – why that conduct meets this definition. They just simply say, all right, unusual cruelty. We're going to put it in that category. So what's the line between, in your view, an ex post facto claim and a claim of the board was arbitrary and capricious and acted contrary to law? Well, I think it's where you can show a practice by the U.S. Parole Commission of doing so. And we have plaintiffs here, several plaintiffs, and Mr. Bailey, who have demonstrated that there is a practice here of the U.S. Parole Commission. Now, maybe they believe it's because they have unfettered discretion. But what we're trying to say is they didn't have unfettered discretion under the 87 guidelines. And just because they say so, they were basically applying their own parole regime. We have unfettered discretion to define these things however we want. We're going to do that. We can therefore define that any murderer is going to be imprisoned for life without parole. Because we determined that he hasn't served enough time or she was unusually cruel to the victim. And so I think that's where Garner comes in. The court below didn't look at whether this was a practice. They simply said because you can't show a second regime to compare it to, this doesn't meet it. I think in the complaint, plaintiffs alleged that there was a second regime where the U.S. Parole Commission had decided that they're going to ignore the definitions in the 91 policy guideline, actually ignore some other factors in the 1987 regulations, and start denying parole on whatever basis they wanted to use. And I see my time is well over. All right. We'll give you some time to reply. Okay. Mr. Burt. May it please the Court, good morning. I'd like to start with the ex post facto theory and then save a little bit of time for the First Amendment claim as well. The ex post facto theory that the plaintiffs have put forward is certainly, as our donors have identified, that it's a two-step theory that the Commission erred in applying the 91 policy memo as a way of interpreting the 87 guidelines. And because of that, they were necessarily applying some unwritten, undescribed set of other standards, secret law, secret standards. The entire attempt doesn't get off the ground because they can't meet the first step of their own theory, which is they can't show that it was inconsistent with the 91 policy. And, indeed, the case of Mr. Houston illustrates that very well. The appendix, page 176, 179, explains the factual basis for the finding of exceptional cruelty, which is that it was a roadside robbery. He had lured a passing motorist to stop. The motorist turned out to be an off-duty corrections officer. And there was a witness who heard the victim say, I don't have any more money, I already gave you all the money. The victim was told to stand up, and Mr. Houston then fired a shot at him at point-blank range while he was still in the vehicle. The sort of wanton nature of the crime here certainly supports the finding of unusual cruelty. Counsel himself referred to the crime as heinous. I think this goes well beyond what is necessary to support the conviction. It's fairly obvious that this did not violate the standards under the 1991 policy memo. Therefore, their theory doesn't even get off the ground. The second part of their theory also fails completely because they've done absolutely nothing to suggest that there is some sort of secret law. They didn't even request discovery on that point, but they had nothing to suggest that there was any such thing. They've made no attempt to outline what that unwritten policy looked like. So their ex post facto theory, even as they define it themselves, is completely hollow and fails totally to meet the standards under Garner as applied by Iqbal. This case is not about offense accountability or the 2000 federal guidelines. It's not about the agency claiming it had unfettered discretion. It's not about the agency applying some sort of a catch-all phrase, other circumstances. It's about the claim that there's some sort of secret policy, and there simply isn't. In terms of the First Amendment claim, Mr. Gambrell's claim is patently moot. If you were to look at the appendix, page 36, paragraph 109 of the complaint, it is clear that his First Amendment claim addresses only the 2008 decision to set a four-year set-off. That four-year set-off resulted in a hearing, which he had in 2012. This is now a thing of the past. The claim is moot. There is no claim in the complaint for follow-on relief or for events after that. And even if there were, it's clear that he's using the wrong point of comparison for the arising of the so-called motive to retaliate, as explained in our brief. So for these reasons, we think the district court got it exactly right. Can I just ask, does the record show any neutral reason for extending the set-off time? Neutral reason? Well, in the sense that maybe, you know, the board has a practice, the commission has a practice that, you know, after hearing it year after year after year and being clear that they're not going to grant parole, why do it every year? Why not just say, look, this is not the type of case where we'd be inclined to grant parole, so there's no point in having a hearing for four more years. The thinking that's reflected in the Morales decision, I think, there's nothing that they have alleged that the commission was required to consider and did not aware of particular criteria on that. There's nothing in the record about that? There's nothing in the record. They would need to establish not only that, but change in order to have a claim. If there are no further questions, we would ask them. I do have a question. Mr. Wallach relies on Selma, which relies on our Fletcher case. Right. And on that basis, I think he's making an argument here that you don't necessarily have to have a rule or regulation, but you can have a practice and that that practice can raise ex post facto concerns. And so I'm wondering what the government's response is to that. Well, I'm obviously troubled by that. We respond to that specifically in our brief. I think that that surely can't be enough. I mean, at that point, it becomes equivalent to having a different decision maker and having a hanging judge as opposed to a liberal judge who is going to be lenient on the defendant. That can't be enough. There needs to be something defined. Indeed, the government's position, I think, we have resisted the application of the ex post facto clause and it's not an actual law. And we've lost that battle with respect to the regulations and the policies. But to push it beyond policies to simple practices, I think, goes way too far. Indeed, the language in Garner, I think, is illustrative on this, where it says that the ex post, I'm quoting from 529 U.S. 252, the ex post facto clause should not be used, should not be employed for the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures. And similarly in Morales 514 U.S. 509, quote, the amendment creates only the most speculative and attenuative possibility of increasing the measure of punishment and such conjectural efforts are insufficient, conjectural effects are insufficient. Garner also talks about the need to update understandings of when these kinds of decisions would be made. And if those are going to fall into ex post facto, a simple furthering of experience of the decision maker, if that's going to create ex post facto problems, then the courts are going to be micromanaging. And it's, I think, also illustrative to look at the history of how these cases have arisen. They all started out, well, not all, from a wholesale perspective, this body of law has started out as challenges brought under the due process clause, equal protection. And as those have been shot down, there's no due process right to parole, for example. Then they have moved to different hooks in the Constitution. But there's lots of law in the books about, you know, if you can establish a practice, that could be tantamount to the adoption by an agency of a policy and indeed a regulatory regime. And, I mean, we're obviously bound by the precedent. But, I mean, the point is, even assuming, as you say, your argument is that it wouldn't rise to the level that would be necessary to establish that type of practice. But it would be a difficult case, Your Honor, if the policy or the practice were so well ingrained that everybody followed it, and yet it wasn't written down. I think that that case could be put off. You know, you could have a smoking gun, you know, I mean, who knows. But in any event, I think when you see the more likely scenario when things are not written down, is what we had before the 87 guidelines were put into our regulation, that the application of the unwritten rules leads to wildly disparate results. And that's the problem. And so I think it's an unlikely problem to come along. And that's why I don't think the Court need to develop a theory to address it. Is there no further questions? We would ask that the judgment be affirmed. Thank you. Does Mr. Wald have any time? All right, why don't you take two minutes? Thank you, Your Honor. I would first like to address the mootness argument regarding Mr. Gambrell. Mr. Gambrell was seeking a presumption of vindictiveness based on the U.S. Parole Commission's issuance, after the Selman decision, of a set-off of four years. In the Selman decision, Judge Cavell decided that the 2007 decision of the Parole Commission for Mr. Gambrell was based on offense accountability. In that proceeding, or in that hearing, he received a five-year set-off. And what Judge Cavell had recognized was that over the years, Mr. Gambrell had gone from a one-year set-off under the D.C. Board of Parole when he got heard by them. Then he got heard by the Commission. It was a three-year. And then it was a one-year. And all of a sudden, they go back up to five years in 2007. Well, he challenged that. And the Court found that he had established that that decision was based on offense accountability. So she sent it back to the Commission. And what did the Commission come back with? They rely on that same set-off and say, oh, we're just going to give you four years now because you've already done one year. We're not going to reconsider any of the reasons. And so we believe he has established a presumption of vindictiveness. The fact that it's taken three years for this case to get to this stage is unfortunate, but it should not affect the fact that he's still in jail. And he was recently denied, albeit on this time they gave him a three-year set-off, based on history of crimes in the community and unusual cruelty to your victim. And so his vindictiveness, it doesn't go away. I think what this shows is he should still be entitled to a presumption of vindictiveness that they can overcome if they can show when they go back to the Court that the reasons we gave them this set-off were completely different than what Mr. Gambrell says and were completely aside from offense accountability. I think that's my time. Thank you. Thank you.
judges: Henderson, Rogers, Brown